IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARCUS JOHNSON,                    :
     Plaintiff,                  :
                                 :
vs.                               :         CIVIL ACTION 16-0037-KD-MU
                                 :
TIMOTHY ILIFF, *et al*.,           :
     Defendants.                 :
                                 :

## Report and Recommendation

Plaintiff Marcus Johnson ("Plaintiff"), a prison inmate proceeding *pro se*

and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983.[1] (Doc. 8).  This

action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and

Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants'

Motion for Summary Judgment.  After careful review of the pleadings, and for the

reasons set out below, it is ordered that Defendants' Motion for Summary

Judgment be granted in favor of all Defendants and that the claims asserted

against Defendants be dismissed with prejudice.

### I.    Summary of Action.

Plaintiff filed this suit on January 18, 2016, against Dr. Timothy Iliff, Dr.

Calvin Johnson, Certified Registered Nurse Practitioner Shawn Geohagan,

Warden Cynthia Stewart, and Corizon Services CEO Jay Cowan.  (Doc. 8 at 5-

---

[1]    Plaintiff filed this action, along with a self-styled affidavit and memorandum
in support of a Motion for Preliminary Injunction, on January 18, 2016.  (Docs. 1-
3).   The Court denied Plaintiff's Motion for Preliminary Injunction and ordered
Plaintiff to file an amended complaint in accordance with the Court's § 1983 form.
(Docs. 9, 15).  It is Plaintiff's amended complaint (Doc. 8) and its incorporated
exhibits that comprise the current complaint of this action.

7).  Plaintiff alleges that he suffers from an extremely painful softball-sized ventral hernia which Defendants refuse to treat properly with surgical repair and instead have opted to treat by prescribing a hernia belt and pain medication.  (Doc. 8-1 at 4-5).  Specifically, Plaintiff alleges Defendants Iliff and Geohagan failed to provide him with adequate medical care for his hernia and that Defendants Johnson and Stewart, as supervisors, [2] are legally responsible for the deficient medical treatment .  (Doc. 8 at 5-7).  Plaintiff requests that the Court order the defendants to provide surgical repair of his ventral hernia and to pay monetary damages.  (*Id*. at 8; Doc. 8-1 at 6).

Defendants, Dr. Timothy Iliff, Dr. Calvin Johnson, Shawn Geohagan, and Cynthia Stewart, have answered the suit and filed a Special Report, which the Court has converted in to a Motion for Summary Judgment.  (*See* Docs. 42-43, 46).  And, Plaintiff has subsequently filed a Response to the motion.  (Doc. 53).  After a thorough review of the record, it is determined that this motion is ripe for consideration.

## II.    Factual Background.

---

[2]    In Plaintiff's amended complaint (Doc. 8), Plaintiff named as on of the defendants a Jay Cowan, CEO of Corizon Medical Services.  According to the Conflict Disclosure Statement filed by Defendants, Dr. Timothy Iliff, Dr. Calvin Johnson, and Shawn Geohagan, "the current CEO of Corizon is not 'Jay Cowan' and nor has Corizon's CEO ever been a person named 'Jay Cowan.'"  (Doc. 21 at fn1).  On December 21, 2016, Plaintiff was ordered "to provide the Court with the correct name of the CEO of Corizon Medical Services within 30 days of [the] order, if Plaintiff wishe[d] the CEO to remain as a defendant in this action."  (Doc. 32).  To date, Plaintiff has failed to comply with the Court's order.  Based on Plaintiff's action (or inaction), the Court determined that Plaintiff has abandoned the claim against "CEO of Corizon Medical Services Jay Cowan" and dismissed said claim from this action for failure to follow the Court's order, pursuant to Fed. R. Civ. P. 41(b).  (*See* Doc. 58).

Defendants have presented the Court with sworn declarations summarizing Plaintiff's medical condition and the history of his treatment while imprisoned at Fountain Correctional Facility (*See* Docs. 43-1 – 43-5), as well as copies of Plaintiff's medical records dating from 2014 through December of 2016, with the exception of the records from Atmore Community Hospital where Plaintiff underwent a CT scan followed by hernia repair surgery on December 9, 2016. (*See* Doc. 43-6). Plaintiff has provided additional evidence in the form of approximately five sick call requests dating from 2004 through 2011.[3]

In 1996, Plaintiff suffered an abdominal gunshot wound and received surgery for it; thereafter, in May 1997, he was convicted, sentenced, and imprisoned within the Alabama Department of Corrections for burglary and murder. (*Id.* at 227; Doc. 8 at 7). While incarcerated, Plaintiff developed a ventral hernia[4] at the previous surgical site and on January 16, 2003 was provided surgical repair of the hernia. (Doc. 43-5 at 2; Doc. 43-6 at 307). As early as June of 2004, Plaintiff again developed a ventral hernia and began receiving treatment for the symptoms within the prison's health care unit. (Doc. 8-1 at 10). On May 15, 2006, Plaintiff received his second hernia repair surgery while incarcerated. (Doc. 43-5 at 2; Doc. 43-6 at 287-303).

---

[3] The evidentiary record and undisputed facts provide a detailed pictured of Plaintiff's medical condition and the treatment and care received. Where Plaintiff has failed to properly dispute a material fact in Defendants' statement, the Court has deemed that fact undisputed pursuant to Fed. R. Civ. P. 56(e) and *Williams v. Slack,* 438 F. App'x 848, 849 (11th Cir. 2011).

[4] "A ventral hernia, also known as an umbilical hernia, occurs when an opening develops in the abdominal wall due to muscle weakness at that point. Ventral hernias often develop at the site of past surgical incisions." (Doc. 43-3 at 2).

It is unclear exactly when Plaintiff developed the third ventral hernia, subject of this suit, but according to the record, on May 28, 2011, Plaintiff reported abdominal pain when he stood or moved and complained that the pain had been progressively worsening for two months. (Doc. 8-1 at 12). The nursing staff instructed him to take Tylenol for the pain and wear his provided hernia binder. (*Id*.). By fall of 2014, Plaintiff's complaints of abdominal pain, consistent with a hernia, were frequent.

On September 8, 2014, Certified Registered Nurse Practitioner Shawn Geohagan ("Geohagan") examined Plaintiff for complaints of stomach pain and having blood in his stool for four days. (Doc. 43-6 at 176). Geohagan ordered a hemmocult card to test for the presence of blood in Plaintiff's stool, but the results were negative for the specimens taken on September 8 and September 12, 2014. (Doc. 43-6 at 147; Doc. 43-4 at 2-3).

On September 22, 2014, Geohagan examined Plaintiff, following a sick call request for stomach pain, swelling, and a request for an x-ray scan. (Doc. 43-6 at 175; Doc. 43-4 at 3). Geohagan noted Plaintiff's chronic abdominal discomfort on the chart but indicated Plaintiff's "large abdomen [was] due to obesity state" (Plaintiff, who stands 5 feet 10 inches tall, is reported as weighing 290 pounds on the date of the exam) and did not order any diagnostic imaging at that time. (Doc. 43-6 at 177).

On September 25, 2014, Plaintiff was seen by a nondefendant nurse in the Chronic Disease Clinic for routine care for his medical conditions, and the presence of an abdominal hernia was indicated on the chart, an abdominal

binder was prescribed to hold the hernia in to place, and a notation was made to for the nurse to discuss with Dr. Iliff whether or not surgical repair of the hernia was advisable.  (Doc. 43-6 at 151).

On October 9, 2014, Dr. Iliff examined Plaintiff for complaints of hernia pain that had been present for "years," and noted a "large ventral hernia" on the right side of Plaintiff's abdominal surgical scar.  (Doc. 43-6 at 12).  Dr. Iliff prescribed Plaintiff Naprosyn for pain and performed an x-ray, which indicated a diffuse ileus, which the radiologist found to be "worse compared to [the x-ray images of] October 11, 2012."  (Doc. 43-6 at 45).  Dr. Iliff, however, indicated that the hernia was not incarcerated at that time and did not recommend surgical intervention due to Plaintiff's weight and risk for increased complications.  (*Id*. at 12).

Plaintiff was subsequently seen in the Chronic Disease Clinic on October 23, 2014 and January 22, 2015, and although Plaintiff failed to voice any complaints of abdominal pain, his hernia was assessed and determined to be reducible at both visits.  (Doc. 43-6 at 27-28).

On April 15, 2015, Plaintiff was examined in the health care unit for complaints of hernia pain; the hernia was reducible, but the examining nurse noted she would discuss the possibility of surgical intervention with Dr. Iliff.  (*Id*. at 10, 14).

On April 23, 2015, Plaintiff was seen in the Chronic Disease Clinic with complaints of abdominal pain and swelling and was scheduled an appointment with Dr. Iliff.  (*Id*. at 31).  Dr. Iliff saw Plaintiff the next day and again confirmed by

examination a "large ventral hernia" at the site of past surgeries and further noted that he would discuss Plaintiff's condition with the Regional Medical Director. (*Id.* at 10).

On July 21, 2015, Plaintiff was again seen in the Chronic Disease Clinic and complained of abdominal pain persisting for approximately 12 years. (*Id.* at 30). A week later, Dr. Iliff examined Plaintiff on July 28, 2015, finding Plaintiff's weight had decreased to 264 pounds and estimated Plaintiff's hernia to be "softball" sized. (*Id.* at 46-47). Dr. Iliff notes that Plaintiff has "complained of pain regularly" and recommends a surgical evaluation. (*Id.*). However, Dr. Hood (who is not a party to this suit) denied Dr. Iliff's request for a surgical consult on July 29, 2015, and recommended managing Plaintiff's care on site. (*Id.* at 46).

The nursing staff and Dr. Iliff again examined Plaintiff on November 2, 2015 for complaints of hernia pain. (*Id.* at 11). Dr. Iliff noted Plaintiff's obese state and chronic abdominal pain from ventral hernia. (*Id.*). Plaintiff confirmed he was using the provided abdominal binder, and Dr. Iliff assessed that the hernia was still reducible. (*Id.*). Dr. Iliff determined and discussed with Plaintiff that a conservative treatment plan of medication and binder use was appropriate given Plaintiff's obesity and surgical history. (*Id.*). Following this examination, Plaintiff submitted a formal grievance stating:

> When I went to see the doctor he told me I had a hernia I have been going back and forth for several years trying to get my stomach fixed. My stomach is constantly swelling look like a tumor, constantly in pain. I asked the doctor was he going to do anything to fix my stomach. And his reply was, 'It wouldn't do any good to have it fixed, the same thing would happen again.' He clearly stated that, 'he wasn't going to do anything to have it fixed!'

(*Id*. at 74).

On November 9, 2015, Nurse Practitioner Shawn Geohagan examined Plaintiff (weighing 246 pounds) and again discussed the conservative treatment plan for the hernia with him.  (*Id*. at 55).  Although Plaintiff disagreed with the plan, he confirmed his understanding of it.  (*Id*.).

 On December 12 and 13, 2015, Plaintiff completed sick call request forms complaining of pain and swelling in his abdomen and blood in his stool and requested stronger medication for the pain.[5]  (*Id*. at 16-17).  The requests were received by the health care unit on December 14, 2015, and the nursing staff examined Plaintiff on December 15. 2015, noting pain in the right side of Plaintiff's stomach for 12 years that increased with movement and confirming normal vital signs, active bowel sounds, and that Plaintiff had had a bowel movement the previous day.  (*Id*. at 15).

On December 21, 2015, Geohagan saw Plaintiff for complaints of stomach pain after eating and diarrhea.  (*Id*. at 55).  Geohagan confirmed a soft, non-tender abdomen and diagnosed Plaintiff with gastroesophageal reflux disease and prescribed Zantac at 150 mg to be taken twice a day for 180 days.  (*Id*.).

Geohagan again saw Plaintiff in the Chronic Disease Clinic on February 1, 2016 and May 2, 2016, where Plaintiff did not mention complaints of abdominal pain or swelling, and Geohagan again confirmed a soft, non-tender abdomen. (*Id*. at 38-39).

---

[5]     Plaintiff's December 13, 2015 sick call request stated, "My stomach is in pain and it want[sic] stop hurting and it's swelling!  Doctor I been in pain years and I can't take no more I need a stronger pain pill!"  (Doc. 43-6 at 17).

On May 10, 2016, Plaintiff submitted a sick call request form complaining of a "risen" formed on the right side of his stomach that had puss coming out of it. (*Id*. at 68). The nursing staff examined Plaintiff the same day for the complaint, and the nursing notes indicate the presence of a "hot, red, tender, odoriferous" 10 mm bump on the right side of Plaintiff's abdomen with slight yellow discharge draining from the site. (*Id*. at 66-67). Plaintiff was prescribed 375 mg of Naproxen to be taken twice a day for 30 days, Bactrim to be taken twice a day for 10 days, and a follow up appointment was scheduled for one week later. (*Id*. at 67).

On July 19, 2016, Plaintiff presented to the health care unit with complaints of stomach pains and difficulty digesting his food. (*Id*. at 63, 65). Plaintiff reported to the nursing staff that for approximately four days to a week he not only suffered from abdominal cramping but also nausea, vomiting, and diarrhea. (*Id*. at 63). When examined on July 20, 2016 by Nurse Practitioner Geohagan, Plaintiff complained that for three weeks he had suffered from pain in his upper right abdominal area, that food was "souring on stomach," that he was vomiting, and had seen blood in his stool. (*Id*. at 55). Geohagan's examination revealed a soft abdomen with mild tenderness, and Geohagan prescribed Pepto-Bismol, Prilosec, and two antibiotics for a possible infection. (*Id*.; Doc. 43-4 at 4).

On August 3, 2016, Plaintiff filed an Inmate Request Slip stating:

> Dr. Stone, since 1997 I have been having serious problems from a gunshot wound to my stomach. . . my food does not properly digest, and I have blood in my bowel movements. The pain is getting worse, and I am bleeding more. I need help. GOEHAEN[sic] won't do anything to help.

(Doc. 43-6 at 61). Nurse Practitioner Geohagan followed up with Plaintiff that same day and noted Plaintiff's continued complaints of pain and dark stools. Geohagan charted active bowel sounds, a flat and erect abdomen, and scheduled Plaintiff an appointment with nondefendant Dr. Karen Stone. (*Id*. at 56; Doc. 43-3 at 1).

Dr. Stone ordered an x-ray of Plaintiff's abdomen on August 11, 2016, which indicated "a slight, small bowel loop dilation consistent with mile ileus" but showed no significant bowel obstruction. (Doc. 43-6 at 44). Dr. Stone then examined Plaintiff on August 12, 2016 for his concerns of abdominal pain. (*Id*. at 56). Dr. Stone reviewed Plaintiff's history, and her examination confirmed a large ventral hernia which was reducible, revealed no blood in Plaintiff's stool, but Dr. Stone detected some bowel within the hernia. (*Id*.; Doc. 43-5 at 12). Dr. Stone scheduled a follow up for assessment for Plaintiff and noted the possibility of discussing Plaintiff's care with the Regional Medical Director, Dr. Hood, and obtaining a possible surgical consultation. (Doc. 43-6 at 55; Doc. 43-5 at 12).

On September 10, 2016, Plaintiff was examined by the nursing staff for complaints of hernia pain, gas, and blood in stool. (Doc. 43-6 at 184). The chart notations indicate Plaintiff's abdomen was soft and non-tender. (*Id*.).

On September 27, 2016, Plaintiff was seen in the Chronic Disease Clinic and denied abdominal discomfort, and the nurse's examination revealed active bowel sounds without tenderness or distention in his abdomen. (*Id*. at 37).

On October 4, 2016, Geohagan examined Plaintiff and ordered a hemmocult study after Plaintiff complained of blood in his recent stools, and

blood was confirmed in the specimen. (*Id*. at 185; Doc. 43-5 at 13). Geohagan prescribed Miconazole 2% to be used twice a day for 42 days,[6] instructed Plaintiff to continue to wear his abdominal binder, and scheduled Plaintiff and appointment with Dr. Stone. (Doc. 43-6 at 185).

On November 16, 2016, Dr. Stone examined Plaintiff for hernia complaints and symptoms. (*Id*. at 203-4). Dr. Stone's exam revealed the hernia remained reducible but with significant diastasis, or separation in the abdominal muscle. (*Id*.). Noting that Plaintiff (weighing 220 pounds) had lost 68 pounds in the preceding two years, Dr. Stone submitted a request for an abdominal CT scan, indicating she suspected "intermittent gut incarceration from [the] hernia and possibly from adhesions." (*Id*. at 185, 204). The Regional Medical Director, Dr. Hood, approved the CT scan on November 18, 2016, and the scan was performed at Atmore Community Hospital on December 9, 2016. (*Id*. at 203, 197).

The abdominal CT scan revealed:

> multiple loops of dilated small bowel within the central and left abdomen. A ventral hernia is noted with a portion of the small bowel loop herniating along the mid anterior abdominal wall. . . . Small bowel obstruction with transition point at the site of the ventral hernia just above the abdominal wall mesh. . . findings were discussed with ER physician.

(*Id*. at 197-98).

---

[6] "Miconazole is used to treat skin infections such as athlete's foot, jock itch, ringworm, and other fungal skin infections (candidiasis). . . . Miconazole is an azole antifungal that works by preventing the growth of fungus." Miconazole Nitrate 2 % Topical Cream, https://www.webmd.com/drugs/2/drug-3841-787/miconazole-nitrate-topical/miconazole-topical/details, Last visited December 12, 2017.

The evidence before the Court lacks any medical records from Atmore Community Hospital beyond the CT scan, but according to the Defendants, Plaintiff ultimately underwent surgery to repair his ventral hernia and a bowel obstruction on December 9, 2016, following the CT scan. (*Id*. at 227; Doc. 43-5 at 2). While hospitalized at Atmore Community Hospital, Plaintiff developed a fever, a perforated bowel, an abdominal fistula and pneumonia. (Doc. 43-6 at 227; Doc. 43-5 at 14). On December 16, 2016, Plaintiff was transferred to University of South Alabama Medical Center ("USA Medical"), in Mobile, Alabama, for a higher level of care, and upon arrival was admitted to the surgical intensive care unit. (Doc. 43-6 at 227; Doc. 43-5 at 15). The medical staff at USA Medical created colostomies for Plaintiff's bowels and started him on total parental nutrition ("TPN"), which supplied nutrients to him through an IV and bypassed his digestive system. (Doc. 43-6 at 227; Doc. 43-5 at 15). Abdominal CT scans conducted on December 16, 2016 and January 3, 2017, confirmed the continued presence of fistulas as well as metallic fragments in his abdomen from his previous gunshot wound. (Doc. 43-6 at 283-84). Attempts to close the fistulas at USA Medical were unsuccessful, but Plaintiff stabilized to the point that the hospital staff determined Plaintiff's treatment could be continued in the Fountain health care unit. (*Id*. at 285). Plaintiff was discharged from USA Medical on January 4, 2017, with two ostomy appliances over fistulas and on TPN. (*Id*. at 227).

Plaintiff was discharged for the prison health care unit on May 9, 2017 and continues to receive off-site follow up evaluations by his treating specialists.

(Doc. 50 at 1; Doc. 43-5 at 16).  Defendants contend that Plaintiff continues to improve, but he has yet to recover sufficiently to undergo the procedure to repair the fistulas and remove the colostomies.  (Doc. 43-5 at 16).

### III.    Summary Judgment Standard.

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)[7]; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'"(emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting

---

[7]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts.  The standard for granting summary judgment[, however,] remains unchanged. . . . The amendments [have] not affect[ed] continuing development of the decisional law construing and applying these phrases."  Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments.

evidence showing there is no dispute of material fact, or by showing the district

court that the nonmoving party has failed to present evidence in support of some

element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the
> nonmoving party to go beyond the pleadings and by [its] own
> affidavits, or by the 'depositions, answers to interrogatories, and
> admissions on file,' designate 'specific facts showing that there is a
> genuine issue for trial.'" *Id*. at 324. To avoid summary judgment,
> the nonmoving party "must do more than show that there is some
> metaphysical doubt as to the material facts." *Matsushita Elec.
> Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct.
> 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of
> the nonmovant must be believed and all justifiable inferences must
> be drawn in its favor. *See Anderson*, 477 U.S. at 255.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286,

1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends

only to "genuine" disputes over material facts. A genuine dispute requires more

than "some metaphysical doubt as to material facts." *Garczynski*, 573 F.3d at

1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the

nonmoving party must produce substantial evidence in order to defeat a motion

for summary judgment. *Id*. In addition, "[t]here is no burden upon the district

court to distill every potential argument that could be made based upon the

materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar

Corp*., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing

parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment."

*Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686

(2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011)

("In cases where opposing parties tell different versions of the same events one

of which is blatantly contradicted by the record—such that no reasonable jury

could believe it—a court should not adopt the contradicted allegations." (citations

omitted) (unpublished)).[8]

### IV.    Discussion.

As previously discussed, Plaintiff Johnson brings this suit for inadequate

medical care pursuant to the Eighth Amendment and seeks injunctive and

monetary relief against Defendants.

### a.    Injunctive Relief Sought is Moot.

In his complaint, Plaintiff seeks a court order requiring surgical repair of

his ventral hernia.  (Doc. 8 at 8).  As discussed previously, the record clearly

evidences that, since the filing of this lawsuit, Plaintiff has undergone surgery to

repair his ventral hernia and a bowel obstruction on December 9, 2016.  (Doc.

43-6 at 227; Doc. 43-5 at 2).  As such, Plaintiff's original claim of deliberate

indifference for failure to receive surgery for his hernia is moot.

In opposition to this motion for summary judgment, however, Plaintiff

indicates, for the first time, that he "is . . . questioning . . . the delay in treatment."

(Doc. 53 at 15).  For this reason, and out of an abundance of caution, the

undersigned will address the merits of Plaintiff's Eighth Amendment claim,

including the delay in receipt of surgical repair of the hernia.

---

[8]    "Unpublished opinions are not considered binding precedent, but may be
cited as persuasive authority."  11th Cir. R. 36-2.

### b. Deliberate Indifference Standard.

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1972) (Eighth Amendment is applicable to the states through the Fourteenth Amendment). In order to prevail on his Eighth Amendment claim, Plaintiff must make both an objective and a subjective showing. In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the Court delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

25 F.3d at 983; *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Thus, Plaintiff must prove that there was "a substantial risk of serious harm," that Defendants were subjectively deliberately indifferent to that risk, and causation. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995); *see also Farmer v. Brennan*, 511 U.S. 825, 832-34, 114 S. Ct. 1970, 128 L.Ed. 2d 811 (1994).

> For medical treatment to rise to the level of a constitutional violation, the care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citations omitted). A medical need may be considered serious if a delay in treating it makes it worse. *Danley v.*

> *Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008). To show deliberate
> indifference to a serious medical need, a plaintiff must demonstrate
> that defendants' response to the need was more than "merely
> accidental inadequacy, negligence in diagnosis or treatment, or
> even medical malpractice actionable under state law." *Taylor v.
> Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and internal
> quotations omitted).

*Palazon v. Sec'y for the Dep't of Corr.*, 361 F. App'x. 88, 89 (11th Cir. 2010).

###   c.   Plaintiff has Failed to Show that the Medical Defendants Acted with Deliberate Indifference.

Assuming without deciding that Plaintiff has demonstrated a serious medical need under the first element of a deliberate indifference claim, no reasonable juror could find that Defendants Iliff and Geohagan acted with subjective deliberate indifference to a known risk of serious harm.

By a sworn declaration, Dr. Timothy Iliff affirms that while employed by Corizon Health, Inc., as the Medical Director at Fountain Correctional Facility from September of 2012 through February of 2016, he treated Plaintiff multiples times for his ventral hernia subject of this complaint. (Doc. 43-3). Dr. Iiff expounds that over his 30 years of practicing medicine, he has treated hundreds of patients with ventral hernias and that:

> in the course of treating patients with ventral hernias, [his]
> examinations primarily focus upon any possible acute development
> with the hernia warranting either immediate intervention or
> indicating a specialty surgical referral or surgery. Such acute
> developments may include redness or discoloration in the skin
> around the hernia, fluid collection around the hernia, swelling at the
> site of the hernia, signs of an infection, a possible bowel obstruction
> and an incarcerated hernia, i.e., an inability to reduce the hernia by
> applying pressure to return the tissue to its original position.

(*Id*. at 2-3).  Dr. Iliff further provides that he refers patients for surgical consultations if he detects an indication of strangulation or incarceration, which was not present in the case at hand.  (*Id*. at 3).

The undisputed facts show that Defendants were not subjectively aware of any serious risk of harm from Plaintiff's prescribed course of medical treatment, and they did not disregard any such risk by a course of action that constitutes more than gross negligence.  While there is evidence that Plaintiff's hernia was painful at times, his complaints and requests for medical care were never ignored by Defendants or other health care officials.  The record shows Plaintiff has been monitored, evaluated, and treated throughout his incarceration with pain medication, a hernia belt, activity limitations, diagnostic scans, blood workups, hemoccult samples, and surgeries. (*See* Doc. 43-6).  After physical examinations of Plaintiff, Dr. Iliff and Geohagan assessed that surgery involved a number of risks and increased complications due not only to Plaintiff's state of obesity[9] but his surgical history and comorbid medical conditions, including hypertension and diabetes.[10]  (*See* Doc. 43 at 11).  Additionally, Plaintiff's ventral hernia remained reducible throughout the time period subject of this action.

---

[9]     Dr. Iliff opined that he "would avoid surgery unless incarcerated" as Plaintiff's weight "increases complications".  (Doc. 43-6 at 12, 177).

[10]    In opposition to this motion, Plaintiff argues that neither Defendant Geohagan nor Dr. Iliff ever explained how or why surgical repair of his hernia was denied due to his obese state.  (Doc. 53 at 2).  The record evidence, however, belies such a claim.  The chart notations from Dr. Iliff and Geohagan indicate that they discussed the conservative treatment plan with Plaintiff on September 2 and November 9, 2015, and the response to Plaintiff's filed grievance states that the Nurse Practitioner explained on 11/9/15 why Plaintiff did not qualify for surgery.  *Cf., Scott v. Harris*, 550 U.S. 372, 380 (2007)(Where record blatantly contradicts a party's set of facts, "so that no reasonable jury

The law in this circuit supports delaying or denying hernia repair surgery while a hernia remains reducible, as long as other medical treatments or care are provided. In reaching this conclusion, a survey of case law (mostly unpublished) reveals, there has never been a finding in the Eleventh Circuit that an inmate's rights were violated when prison officials chose not to provide surgery for a reducible hernia, or delayed such a surgery. *See Lind v. Dir., Fla. Civ. Commitment Ctr.*, No. 2:16-cv-3-FtM-29MRM 2017, U.S. Dist. LEXIS 73986, 2017 WL 2123383 (M.D. Fla. May 16, 2017) (finding the plaintiff was seen by doctors regularly and they did not want to operate as long as the hernia remained reducible); *Adams v. Cherry*, No. 4:08cv572-MP/WCS2010 U.S. Dist. LEXIS 142098, 2010 WL 6089073 (N.D. Fla. Sept. 23, 2010) (same); *Paz v. Stone*, No. CV 313-065, 2015 U.S. Dist. LEXIS 28576 (S.D. Ga. Jan. 26, 2015) (concluding the plaintiff received conservative medical treatment for his reducible hernia and his desire for a different mode of treatment, surgery, does not amount to deliberate indifference); *McCovery v. Sherman*, 2009 U.S. Dist. LEXIS 79742, 2009 WL 2858001, 9 (S.D. Ala. Aug. 28, 2009) (failed to show denial of his Eighth Amendment right to medical care in delay of surgery to repair inguinal hernia while it was reducible); *Camacho v. Corrs. Corp. of America*, CV 304-22, 2006 U.S. Dist. LEXIS 8235 (S.D. Ga. Jan. 20, 2006) (concluding that the inmate's deliberate indifference claim lacked merit because he did not show that his hernia required surgical repair, or that any defendant "deliberately refused to

---

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

provide necessary medical care.").  In standing with our sister courts, the undersigned finds that Plaintiff received adequate medical treatment for his reducible hernia, including medications, constant evaluations, and a hernia belt. Plaintiff's desire for a "different, less conservative mode of medical treatment does not amount to deliberate indifference" and delay in providing the surgery for a reducible hernia did not violate the Eighth Amendment.  *Breach v. Prison Health Serv*., 2009 U.S. Dist. LEXIS 114976, 2009 WL 4827363, *14 (M.D. Ala. Dec. 10, 2009).

In opposition to this motion for summary judgment, Plaintiff highlights the fact that Dr. Iliff requested a surgical consult for possible hernia repair on July 28, 2015 (approximately a half a year before this lawsuit was filed and nearly a year and a half before he received hernia repair surgery) but that the request was denied by the Regional Medical Director, Dr. Hugh Hood.  (Doc. 43-6 at 46-47). Although Plaintiff fails to articulate a specific argument related to the surgical request and denial, there are two issues present: 1) whether or not the denial establishes deliberate indifference, and 2) whether the denial created a delay for which Defendants are liable.

As to the first concern, the denial fails to evidence deliberate indifference. The decision to deny the surgery in 2015 was due to Dr. Hood's medical judgment to treat Plaintiff onsite and manage his care conservatively based on a review of Plaintiff's medical condition and Dr. Iliff's chart notes.  A difference of opinion in treatment options and patient management, without more, does not

demonstrate deliberate indifference. The Eleventh Circuit stated in *Bismark v. Fisher*:

> "Nothing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that a 'simple difference in medical opinion' does not constitute deliberate indifference."

213 F. App'x 892,897 (11th Cir. 2007), *quoting Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Courts have long recognized that such a question, as "whether governmental actors should have employed additional diagnostic techniques or forms of treatment[,] is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Id.* at 896; *quoting Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995)(internal quotation marks omitted). The record indicates that at the time the surgical consult was requested, Plaintiff's hernia was admittedly large in size, but Plaintiff remained obese and afflicted with various chronic medical conditions; the hernia remained reducible; Plaintiff continued to be monitored every three months through the Chronic Disease Center, evaluated upon every sick call request, and treated with pain medications, antibiotics, hernia belts, and diagnostic tests and scans as needed. Accordingly, the denial of the surgical consult cannot be seen as anything other than a professional opinion and judgment call for which there is not constitutional violation.

To the extent Plaintiff claims the delay in receipt of hernia repair surgery is a constitutional violation, the undersigned finds a "[d]elay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to

unnecessary and wanton infliction of pain." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (internal citations and quotation marks omitted).  However, to succeed in proving that the delay of medical care rose to a constitutional violation, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.  *Id*. at 1188-89 (internal citations omitted) (footnotes omitted); *see also, Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1307 (11th Cir. 2009).  In this case, Plaintiff puts forth no evidence that the delay worsened his medical condition or caused the resulting surgical complications.  To the contrary, the record indicates the reticence of the medical providers to advise a third abdominal surgery based on the risk of complications given Plaintiff's medical history and physical state.  It is also clear that despite the unfortunate complications that transpired following Plaintiff's hernia repair surgery, Plaintiff continues to receive ongoing medical care, including care from specialists.

The record further supports that the cause of the delay in receiving surgery was due to the medical assessment and judgment of Defendants and medical officials who opined that as long as the hernia remained reducible and treatable without surgery, surgical intervention should be avoided.  *E.g*., *Palazon v. Sec'y for the Dep't of Corr.*, 361 F. App'x. 88, 89 (11th Cir. 2010).

Plaintiff's case is very similar to *Palazon v. Sec'y for the Dep't of Corr.*, 361 F. App'x. 88, 89 (11th Cir. 2010), where the Eleventh Circuit affirmed the granting of summary judgment against the plaintiff and his claims of deliberate indifference regarding the pain caused by the prison defendants' delay in providing surgical hernia repair. *Id.* at 89. Analogous to this action, the "doctors [in *Palazon*] did not want to operate on the hernia as long as it remained reducible." *Id.* The facts showed that the plaintiff received treatment for this hernia symptoms on many occasions, received a hernia truss, pain medication, and a wheel chair to assist in mobility, and that his hernia remained reducible at all times. *Id.* The Eleventh Circuit reasoned that the care received was not "grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness." *Id.* (internal citation omitted).

Likewise, in *Jackson v. Jackson*, the plaintiff argued he should have received hernia surgery earlier than he did. 456, F. App'x 813, 814 (11th Cir. 2012). The evidence showed "Jackson received treatment for his hernia symptoms, including receiving pain medication and a hernia truss" and "Jackson's hernia was non-strangulated and posed no risk". *Id.* The Eleventh Circuit thus concluded that "[b]ecause it is common medical practice to postpone surgery until a hernia becomes strangulated," the surgery was considered elective and did not rise to the level of a constitutional violation. *Id.* at 814-15. The Court further stated:

> The care Jackson received was adequate and certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Harris,* 941 F.2d at 1505. The delay in receiving surgery was

because the hernia remained treatable without surgery and posed no risk to Jackson's health. Moreover, the delay did not worsen Jackson's condition. *See Mann*, 588 F.3d at 1307. That Jackson felt he should have had surgery earlier than he did is insufficient to support a deliberate indifference claim. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); *Harris*, 941 F.2d at 1505 (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment).

*Id*. at 815; *see also, Williams v. Young*, No. 4:15cv219-RH/CAS, 2016 U.S. LEXIS 191342 (N.D. Fla. Sept. 28, 2016) (No deliberate indifference found in decision to delay surgical hernia repair when evidence shown the plaintiff received medical care and there was no proof offered that the surgical outcome would have been better had the surgery occurred sooner.).

A review of the record reveals that the medical care Plaintiff received was adequate, that the delay in receiving surgery was because the hernia remained reducible, and that no proof has been offered that the delay worsened Plaintiff's condition or outcome. Accordingly, Plaintiff has failed to establish Defendants Geohagan and Dr. Iliff acted with deliberate indifference in providing him medical care in violation of the Eighth Amendment. The undersigned, therefore, recommends that summary judgment be granted in favor of Defendants Iliff and Geohagan, and all claims against them be dismissed.

### d. No Respondeat Superior Liability.

In order to state a claim upon which relief can be granted in a § 1983 action, a plaintiff must establish a causal connection between each defendant's

"actions, orders, customs, policies, or breaches of statutory duty and the alleged deprivation of his constitutional rights." *Frankum v. Chapman*, 2009 U.S. Dist. LEXIS 133760, 2009 WL 1118875, *3 (S.D. Ala. 2009) (citations omitted). Liability for an alleged constitutional violation cannot be established on the basis of a theory of *respondeat superior. See Edwards v. Ala. Dep't of Corrs.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . .").

"[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" *Id.* (citations omitted). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (citations and internal quotation marks omitted). In such instances, Plaintiff must show that the policy or custom was "the 'moving force [behind] the constitutional violation.'" Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or

tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." *Id*. (citations omitted).

In this action, Plaintiff does not allege, much less present evidence, that Dr. Calvin Johnson and Cynthia Stewart were personally involved in any decision related to Plaintiff's medical treatment for his hernia condition. To the contrary, the record reveals that Dr. Calvin Johnson is the retired chief medical officer for Corizon Health, Inc. and has never been a member of the medical staff at Fountain Correctional Facility. (Doc. 43 at 26). As such, Dr. Johnson has never evaluated Plaintiff, provided care to Plaintiff, or participated in the treatment of Plaintiff in any way. (*Id*.).

As to Cynthia Stewart, Warden of Fountain Correctional Facility, Plaintiff argues that he notified Defendant Stewart by letter of his medical condition but that Warden Stewart failed to act and get Plaintiff to the hospital. (Doc. 8 at 7). In support of this position, Plaintiff submits a handwritten, undated letter, titled "Notice of Intent." The letter states in full:

> Warden Cynthia Stewart,
>
> When I went to see the doctor he told me I had a hernia[sic], I have been going back and forth for sereral[sic] years trying to get my stomach fixed, my stomach is constantly swelling, look like a tumor, constantly in pain. I asked the doctor was he going to do anything to fix my stomach. And his reply was, "It wouldn't happen again," He clearly stated that, "he wasn't going to do anything to have it fixed.

(Doc. 8-1 at 15). Defendant Stewart affirms that she is not a licensed doctor or medical professional and does not oversee the provision of medical services to inmates. (Doc. 43-1 at 1). The medical care of Fountain Correctional Facility is

retained through an independent contractor by the Alabama Department of Corrections, and Stewart declares that she entirely defers to, and trusts in, the clinical judgment of the Fountain Correctional Facility medical staff for treating the medical needs of the inmates. (*Id*. at 2).

> [I]t is widely held that non-medical prison personnel are generally entitled to rely on the expertise of the medical staff and are not required to second-guess the medical staff's judgment regarding an inmate's care. *See e.g., Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals); *and Kelly v. Ambroski*, 97 F. Supp. 3d 1320, 2015 U.S. Dist. LEXIS 42877, 2015 WL 1511173 at *20 (N.D. Ala. March 31, 2015) ("in the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference"), *citing Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004).

*Stallworth v. Graham*, No. 4:14-CV-00134-RDP, 2015 U.S. Dist. LEXIS 105806, 2015 WL 4756348, at *17 (N.D. Ala. Aug. 11, 2015).

Consequently, without personal involvement shown, Plaintiff must show a causal connection between the defendants and the harm suffered in order to establish liability as to Defendants Johnson and Stewart, and he fails to do so.

The record is void of facts showing that Plaintiff's surgery was denied or delayed due to a custom or policy created or endorsed by Defendants Johnson or Stewart. Nor does the record contain argument or evidence of a widespread history of hernia surgery denials that placed Defendants on notice to address the medical care at the prison. Additionally, there is no evidence that Defendants directed staff to refrain from providing or prevented staff from providing adequate

medical care.  Thus, Plaintiff has presented no evidence that any custom or policy of Defendant Johnson or Stewart resulted in a constitutional violation related to the medical treatment he received for his hernia.  Accordingly, Plaintiff's claims against Defendants Johnson and Stewart related to that treatment fails as a matter of law.

Therefore, the undersigned recommends that summary judgment be granted in favor of Defendants Dr. Calvin Johnson and Warden Cynthia Myers, and Plaintiff's claims against them be dismissed with prejudice.

## V.    Conclusion.

Based on the foregoing analysis, the undersigned concludes that there are no genuine issues of material fact, and that Defendants Dr. Timothy Iliff, Shawn Geohagan, Dr. Calvin Johnson, and Cynthia Stewart are entitled to judgment as a matter of law on all claims and causes of action interposed by Plaintiff. Therefore, it is recommended that Defendants' Motion for Summary Judgment be granted on all counts and that Plaintiff Marcus Johnson's action against Defendants be dismissed with prejudice.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this

document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. L.R. 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."  11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

   **DONE** this 1st day of February, 2018.

        s/ P. Bradley Murray
        UNITED STATES MAGISTRATE JUDGE